## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 09-3448

NICHOLAS STAMAT and PENNY STAMAT,

*Debtors-Appellants*,

*v.*

WILLIAM T. NEARY, United States Trustee,

*Trustee-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 6543—**Joan B. Gottschall**, *Judge*.

ARGUED SEPTEMBER 27, 2010—DECIDED MARCH 24, 2011

Before ROVNER, EVANS, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Nicholas and Penny Stamat filed for bankruptcy under Chapter 7 of the Bankruptcy Code on July 26, 2007. The Trustee alleged that the Stamats omitted numerous assets and transactions from their filings and accompanying documentation, including past business interests, two limited partnerships, a $10,000 settlement payment, and $90,000 ob-

tained through a refinancing of a second home, and misreported their 2006 income. The Trustee filed a complaint objecting to the discharge of the Stamats' debt under 11 U.S.C. §§ 727(a)(2), (4), and (5), arguing that the Stamats concealed estate assets with the intent to defraud their creditors, fraudulently made false statements under oath, and failed to satisfactorily explain the loss of assets. The bankruptcy court denied discharge under all three grounds. The Stamats appealed that ruling to the district court, which affirmed the denial of discharge under section 727(a)(4) for fraudulently making a false oath. We also find that the Stamats made numerous omissions, that these omissions displayed a reckless disregard for the truth, and were material to the Stamats' bankruptcy case. Therefore, we affirm the denial of discharge under section 727(a)(4).

## I. BACKGROUND

Nicholas Stamat is a medical doctor who operates Stamat Pediatrics. Penny Stamat has a bachelor's degree in math and accounting, owns and operates a billing company, On Time Billing, and handles billing for her husband's medical practice. The Stamats filed a joint voluntary Chapter 7 Bankruptcy Petition on July 26, 2007, requesting the discharge of over $1.5 million in secured and unsecured debt. They also filed the required official bankruptcy Schedules and Statement of Financial Affairs ("SOFA"). *See* 11 U.S.C. § 521(a)(1)(B); Fed. R. Bankr. P. Official Form 6; Fed. R. Bankr. P. Official Form 7. On December 21, 2007, the United States Trustee filed his

complaint objecting to the discharge of the Stamats' debts on three statutory grounds: concealing property with the intent to defraud creditors, making false oaths with fraudulent intent, and failing to satisfactorily explain the loss of substantial assets or deficiency of assets to meet their liabilities. *See* 11 U.S.C. §§ 727(a)(2), (4), and (5). The Trustee argued that the bankruptcy petition and accompanying SOFA and Schedules included a number of misstatements and omissions.

In response to Question 1 of their original SOFA, the Stamats listed the gross income they received from their businesses in 2006 as $53,309. That number was incorrect, since the Stamats' 2006 tax return showed that the gross income of Stamat Pediatrics in 2006 was $265,012, that the gross income of On Time Billing in 2006 was $22,188, and that after the deduction of expenses, the Stamats' personal income was $20,559 for the tax year.

Other inaccuracies also surfaced. On November 14, 2007, the Trustee conducted the First Meeting of Creditors ("§ 341 meeting").[1] At this meeting, the Stamats disclosed past investment or business interests in various entities, including: (a) Meyer Medical Physicians Group, (b) 4425 E. 63rd Medical Center, and (c) Hoffman/Elk Grove Physician Group. Dr. Stamat practiced with Meyer

---

[1] Section 341(a) of the Bankruptcy Code states that, "[w]ithin a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors."

Medical Physicians Group from 1986 until it filed for bankruptcy and ceased to exist in 2001. Dr. Stamat owned an interest in 4425 E. 63rd Medical Center, an investment entity that held title to the building out of which Meyer Medical operated one of its offices. The investment was sold in 2003, and Dr. Stamat received a small profit. Hoffman/Elk Grove was bought before Meyer Medical's existence, and Dr. Stamat never received any monies back from this investment. These interests were not initially disclosed in response to Question 18 of the SOFA,[2] and the Stamats amended Question 18 on May 8, 2008 to reflect their interest in these three entities.[3]

---

[2]  Question 18 reads in pertinent part:

> If the debtor is an individual, list the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time with six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.

[3] The Stamats also did not initially list an interest in Dr. Stamat's medical practice, Stamat Pediatrics, LLC, or an interest in On Time Billing, LLC, Mrs. Stamat's billing practice,

(continued...)

At the § 341 meeting, the Stamats also disclosed owner-ship interests in the following limited partnerships during the six years before their bankruptcy filing: (a) Trailhead Land Investment, L.P. and (b) Eagle Crest Golf Club, Ltd. Partnership. These interests were not disclosed in response to Question 18 of the SOFA.

Dr. Stamat also testified that he worked as a part-time police officer for the Thornton Police Department. Dr. Stamat's position with the police department was not reported in the Stamats' original Schedules or SOFA, but Dr. Stamat's income of approximately $80 a month from his position with the police department was included in the business income listed on Schedule I. On May 8, 2008, the Stamats amended Schedule I and Question 1 of the SOFA to reflect Dr. Stamat's employ-ment and income as a part-time police officer separately from his business income. Dr. Stamat also testified that he owned two guns, which were not disclosed in the Stamats' original schedules. One month after the § 341 meeting, on December 7, 2007, the Stamats amended their Schedule B to include the two guns.

Finally, Dr. Stamat stated at the § 341 meeting that in September of 2005, he paid $10,000 to Oak Brook Financial to settle pending litigation against the Stamats. Mrs. Stamat later testified that this payment was made to settle an outstanding judgment for nonpayment of a

(...continued)

in response to Question 18; however, both Stamat Pediatrics and On Time Billing were disclosed in Schedule B.

loan. The settlement payment was also not listed in the original schedules or Question 10 of the SOFA.[4] The Stamats amended Question 10 of the SOFA on May 8, 2008 to reflect this settlement payment.

On April 16, 2008, the Stamats appeared for a Rule 2004 Examination ("2004 Examination") at the Office of the U.S. Trustee, at which they produced numerous documents, including tax returns, pursuant to a subpoena for documents issued by the Trustee. At this examination, Mrs. Stamat admitted that she and her husband had refinanced their Michigan home twice in the two years before filing their bankruptcy petition, receiving in excess of $90,000 in cash. The loan proceeds were deposited into the Stamats' personal account and the monies were used to run Dr. Stamat's medical practice and for personal living expenses. After disclosing the two transactions, the Stamats submitted all related records in their possession to the United States Trustee.

The bankruptcy court held a bench trial, during which the Stamats testified regarding the above omissions. Mrs. Stamat also testified about a 2001 lawsuit involving Standard Bank regarding property liens. Mrs. Stamat was

---

[4] Question 10 of the SOFA, entitled "Other transfers," states: "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."

questioned regarding the existence of a counterclaim pending against Standard Bank, and stated, "I don't know who sued who." When asked if she was aware of whether or not "you and Dr. Stamat have asked the court to find their mortgage invalid," she answered, "[w]ell, we were suing them since 2001, so I guess in there we were trying to do that." The Trustee argued that a counterclaim existed against Standard Bank, which was not disclosed in their original or amended schedules. The record does not include court documents from the Standard Bank litigation.

After the bench trial, the bankruptcy court found that the Stamats' debt was not dischargeable under 11 U.S.C. §§ 727(a)(2), (4), and (5). The bankruptcy court determined that the Stamats concealed estate assets with the intent to defraud their creditors, made fraudulent false statements under oath, and failed to satisfactorily explain the loss of assets. The Stamats appealed that ruling to the district court, which affirmed the bankruptcy court's decision to deny discharge pursuant to section 727(a)(4) for fraudulently making a false oath, without reaching the grounds under sections 727(a)(2) and (5). This appeal followed.

## II. ANALYSIS

The primary benefit of filing for bankruptcy under Chapter 7 is that the financial discharge gives the debtor a "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003). However, this privilege is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279,

286-87 (1991) (internal quotation marks and citation omitted); *see Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999). The Bankruptcy Code provides that a bankruptcy court "shall grant the debtor a discharge," but then lists several exceptions that deny the privilege of discharge to dishonest debtors. 11 U.S.C. § 727(a).

One of those exceptions, found in section 727(a)(4), provides in relevant part that the court shall grant the debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account . . . ." 11 U.S.C. § 727(a)(4)(A). We have stated that the Trustee must establish grounds for denial of discharge under 11 U.S.C. § 727(a) by a preponderance of the evidence. *In re Scott*, 172 F.3d at 966-67. Other circuits and bankruptcy courts in this circuit have specified that to prevail on a claim under this subsection, the Trustee must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *The Cadle Company v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009) (citing *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001)); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000); *In re Self*, 325 B.R. 224, 245 (Bankr. N.D. Ill. 2005); *In re Olbur*, 314 B.R. 732, 745 (Bankr. N.D. Ill. 2004). "In bankruptcy, 'exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor.'" *In re Kontrick*,

295 F.3d 724, 736 (7th Cir. 2002) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)).

We review the bankruptcy court's conclusions of law de novo and its factual findings for clear error. *In re Resource Tech. Corp.*, 624 F.3d 376, 382 (7th Cir. 2010). "If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, we will not reverse its factual findings even if we would have weighed the evidence differently." *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008) (citation and quotation omitted). Mixed questions of law and fact are subject to de novo review. *Mungo v. Taylor*, 355 F.3d 969, 974 (7th Cir. 2004).

With respect to section 727(a)(4), the bankruptcy court specifically discussed the refinancing of the Stamats' second home and their failure to list their partnership interests, and found that that the Trustee proved by a preponderance of the evidence that the Stamats made numerous false oaths that they knew or should have known were inaccurate, and that the cumulative effect of their false statements was material and established a pattern of reckless indifference to the truth. The district court affirmed the denial of discharge under section 727(a)(4), finding that the Stamats' failure to report the refinancing of their second home, their partnership interests, counterclaim, $10,000 settlement payment, and the error in the reporting of their 2006 income were material omissions that showed a reckless disregard for the truth. We affirm the denial of discharge.

The Stamats first argue that certain omissions cited by the bankruptcy court were not in fact omissions because

the disclosure of those interests was not required. The Stamats contend that there was no need to disclose their interests in Meyer Medical, Hoffman/Elk Grove Physician Group, and 4425 E. 63rd Medical Center given that these assets were no longer in existence at the time the bankruptcy petition was filed. However, the bankruptcy petition does not exempt assets no longer in existence. Question 18 of the SOFA asks for all business interests "within **six years** immediately preceding the commencement of this case," (emphasis in original), and, in fact, asks for "beginning *and ending dates*." (emphasis added). The Stamats do not contend that these investments were outside the six-year window, only that disclosure was not required because these entities did not exist at the time of the bankruptcy filing. Given the clarity of the question, we cannot agree.

The Stamats next contend that their "passive investment interests" in Trailhead Land Investment and Eagle Crest Golf Club did not require disclosure under Question 18 of the SOFA because the Stamats were merely "limited partners" in these enterprises. As both the bankruptcy and district courts noted, there are, in fact, sections of the SOFA that exclude limited partnerships. Official Form 7 of the SOFA states that "[d]ebtors that are or have been in business, as defined below, also must complete Questions 19-25." The form goes on to state that:

> An individual debtor is 'in business' for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following:

> an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, *other than a limited partner*, of a partnership; a sole proprietor or self-employed full-time or part-time.

Fed. R. Bankr. P. Official Form 7 (emphasis added). As the Stamats correctly point out, "limited partners" are exempt from answering Questions 19-25 of the SOFA. However, Question 18 does not exclude "limited partners." While the Stamats argue that the same caveat must be read into Question 18, the question plainly requires disclosure of "all businesses in which the debtor was . . . [a] partner, . . . [or] partner in a partnership," and thus, by its terms, does not exclude limited partnerships. While a limited interest in a partnership may not be as significant as a greater interest, we cannot ignore the distinction the Form itself makes, and find that the failure to include these interests was an omission.

Next, the Stamats challenge both the settlement payment to Oak Brook Financial and the two refinances of their Michigan home as omissions. The Stamats do not argue that the $10,000 payment and the $90,000 refinancing do not constitute transfers of property, rather, they claim that these transactions occurred "in the ordinary course of business or financial affairs," and therefore did not require disclosure under Question 10 of the SOFA.[5]

---

[5] As to the settlement payment, we note that during the bankruptcy proceedings, the Stamats contended that they did

(continued...)

Neither the SOFA nor the Bankruptcy Code define the phrase "in the ordinary course of business or financial affairs" with respect to Question 10. The Stamats argue that in order for a transfer to be outside the "ordinary course," there must be evidence of intent to conceal or fraudulently convey property or assets. While we do not doubt that such a transfer would be outside the ordinary course, we do not find such conduct to be required. In examining the "ordinary course of business" defense under section 547(b) of the Bankruptcy Code, we have found that the "ordinary course of business" refers to "normal commercial and financial relationships," such as, for example, "customary credit transactions," and that factors to consider include the length of time the parties were engaged in the type of transaction at issue, whether the amount or form of tender differed from past practices, and whether the debtor engaged in any unusual collection or payment activity. *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003). "Although a history of dealing between parties is certainly the strongest factor supporting a determination that the business between a debtor and [the transferee] is ordinary, we do not believe it is absolutely necessary in every case." *Id*.

---

(...continued)

not understand the $10,000 payment to be a transfer of property, or believed that it had taken place prior to the two-year period relevant to Question 10. The Stamats do not now make these arguments.

In this case, the Stamats borrowed $10,000 and made a payment to Oak Brook Financial to settle an unpaid loan. Mrs. Stamat testified that Dr. Stamat and others had taken out a loan, the exact amount of which she did not recall. She stated:

> [W]e got sued for like his part of it, 80 some thousand maybe. And then they came to a settlement agreement. And we had put down 25,000. And then we had to pay 15,000 back. And I paid all but 2,000 I had left to pay. And I didn't have the money. So they came back to us for 15,000 which was the judgment. And then we settled with them for 10.

There is no evidence in the record that such a payment was a customary or regularly occurring one, and based on the non-customary nature of the transaction testified to by Mrs. Stamat, we cannot find under the circumstances that the payment falls within the "ordinary course of business or financial affairs."

With respect to the $90,000 received from the refinancing of the Stamats' Michigan home, the Stamats argue that the bankruptcy court actually determined that the use of the proceeds was in ordinary course. In its order, under the section "Defendants' Testimony at Trial," the bankruptcy court wrote that "[t]he refinancing and the use of the proceeds therefrom in the medical practice, was done in the ordinary course of business." The district court found "[t]he Stamats take the finding out of context; the Bankruptcy Court stated that the Stamats so testified at trial; it does not follow

that the Bankruptcy Court necessarily agreed with this testimony." *Neary v. Stamat*, 2009 WL 2916834, at *4 (N.D. Ill. 2009). The bankruptcy court's statement, while falling under the overall heading "Findings of Fact," did appear under the subheading "Defendants' Testimony at Trial." Mrs. Stamat stated, with respect to the refinancing, "[t]o me, that would be an ordinary course of business." However, as the Stamats point out, when asked by the bankruptcy court whether she was "saying that you viewed this in the ordinary course of business of the company," Mrs. Stamat stated that she did not understand the refinancing was a transfer of property, and did not specifically answer the court's question about whether she felt the refinancing was within the ordinary course. Nevertheless, we do not find that the bankruptcy court actually determined that the refinancing and use of the funds was within the ordinary course, especially in light of the bankruptcy court's reliance on the "disappearance of equity from their second home" in its section 727(a)(4) analysis.

Some bankruptcy courts examining "ordinary course," both in the section 727 context and in others, have found that the payment of living expenses occurs in the "ordinary course of affairs." *See In re Oliver*, 414 B.R. 361, 377-78 (Bankr. E.D. Tenn. 2009); *see also In re Keenan*, 195 B.R. 236, 241 (Bankr. W.D.N.Y. 1996) ("meeting his personal expenses was unquestionably within the 'ordinary course' of . . . financial affairs"). Bankruptcy courts have suggested, however, that the transfer of funds between the debtor's personal account and corporations controlled by the debtor is not part of the ordinary course of busi-

ness. *See, e.g., In re Phillips*, 418 B.R. 445, 462-63 (Bankr. M.D. Fla. 2009) ("The Plaintiff established at trial the existence of numerous substantial transfers between the Debtor and various corporations controlled by the Debtor within the two years prior to the filing. . . . [W]hile there is insufficient evidence to establish fraudulent transfer for purposes of denial of discharge under § 727(a)(2)(A), it was clearly established that there were transfers of the Debtor's interests outside the ordinary course of business."). Here, the Stamats acknowledge using the proceeds to pay for both personal expenses and expenses related to Stamat Pediatrics, a separate legal entity. Furthermore, the bankruptcy court in its section 727(a)(5) analysis found that the Stamats failed to satisfactorily explain the loss of the proceeds, which means that all specific uses of the proceeds were not established. In light of this record, we cannot find that the refinancing and use of the $90,000 was in the ordinary course of business or financial affairs.

Next, although the bankruptcy court analyzed the Stamats' reporting of their business income under its section 727(a)(2) analysis, in finding that the Stamats acted with reckless disregard under section 727(a)(4), it referenced their "numerous false statements." With respect to whether Question 1 of the SOFA required the Stamats to report only their personal profit as opposed to their businesses' gross income, the Stamats argue that their medical practice and the billing company are both limited liability companies, and as such, legally distinct from their owners. They contend that the "gross income" the debtor receives from the operation of the businesses

is not the gross income the LLC earns, but rather just the net profit paid to the debtor. The Stamats are correct that Question 1 requests "the gross amount of income the *debtor has received* from . . . operation of the debtor's business." (emphasis added). Like the district court, however, we decline to resolve the question of what Question 1 specifically requires. Even if Question 1 only required the Stamats to report their own personal profit, the amount they reported, $53,309, was incorrect. This figure differed from the actual amount reported on their 2006 tax return, which was $20,559.

The Stamats argue that an over-reporting of income cannot constitute an intent to defraud. As both the bankruptcy and district courts noted, a showing of reckless disregard for the truth is sufficient to prove fraudulent intent. *See In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (citing *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992)); *see also In re Duncan*, 562 F.3d at 695 (finding that "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent" under section 727(a)(4)) (citations omitted); *In re Costello*, 299 B.R. 882, 899-90 (Bankr. N.D. Ill. 2003). While an over-reporting of one's income by itself would likely not amount to fraudulent intent, this error was part of a larger picture of omissions and errors. Here, the totality of the Stamats' omissions and errors rises above mere negligence to the level of reckless disregard for the truth.

Given the Stamats' level of education and business experience, their failure to disclose the required past

business interests, property transfers, and income as discussed above shows a reckless disregard sufficient for the bankruptcy court's finding of intent under section 727(a)(4), and we do not disturb that finding. *See, e.g., In re Chavin*, 150 F.3d at 729 ("Chavin is a mature and experienced businessman . . . ."); *In re Scott*, 172 F.3d at 970 (discussing expectations of sophisticated debtors under section 727(a)(3)). The Stamats' amendments to their filings on December 7, 2007 and May 8, 2008 also do not negate a finding of intent or cure the initial failures. *See Payne v. Wood*, 775 F.2d 202, 205 (7th Cir. 1985) ("The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.").

Finally, a fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Retz v. Samson, et al. (In re Retz)*, 606 F.3d 1189, 1198 (9th Cir. 2010) (internal quotations and citations omitted); *see also Costello*, 299 B.R. at 900. "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992) (quoting 4 Collier on Bankruptcy, ¶ 727.04[1], at 727-59). Other courts have held that the debtor "may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious." *Id*. (quoting *In re*

*Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)). In other contexts, we have stated that the "successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 496 (7th Cir. 2007) (quoting *In re Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974)). Given that the omitted interests relate to the Stamats' estate and assets, we cannot find that the Stamats' omissions were immaterial.[6]

### III. CONCLUSION

For the reasons set forth above, the order of the district court affirming the bankruptcy court's denial of discharge is AFFIRMED.

---

[6] Because we rely on the above omissions to affirm the bankruptcy court's denial of discharge, we need not address the existence (or not) of an undisclosed counterclaim, or the bankruptcy court's findings under sections 727(a)(2) and 727(a)(5).