In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-3200

IN RE: MARGARET KEMPFF,

*Debtor-Appellee.*

APPEAL OF: BRIAN K. FARLEY.

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 14 C 9810 — **Thomas M. Durkin**, *Judge.*

---

ARGUED FEBRUARY 23, 2016 — DECIDED JANUARY 30, 2017

---

Before WOOD, *Chief Judge*, and SYKES and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. Margaret Kempff's ex-husband Bart embezzled more than $1 million from his employer while the two were still married. To evade detection, he attempted to replenish the stolen funds, borrowing $400,000 from his friend Brian Farley on the ruse that the money would be used for a real-estate development. As security for the loan, Bart gave Farley a third-priority lien on the couple's home, forging Margaret's signature on the note and mortgage.

Bart's effort to cover his tracks did not succeed. His em-
ployer discovered the embezzlement and reported it to
police; he was eventually convicted of felony theft. In the
meantime, Margaret divorced him and the couple's home
went into foreclosure. Farley filed a cross-claim in the fore-
closure action seeking to enforce his lien, but the sale of the
home did not yield nearly enough to cover even the first
mortgage. Margaret filed for bankruptcy while the foreclo-
sure was pending, which stayed Farley's claim.

Farley then filed an adversary complaint challenging
Margaret's eligibility for a Chapter 7 discharge. He claimed
that she made a fraudulent transfer after filing her bankrupt-
cy petition and made multiple false statements in her bank-
ruptcy schedules. Margaret testified at trial that these were
innocent mistakes. The bankruptcy judge credited her
testimony and rejected each of Farley's contentions, and the
district court affirmed that decision. We do the same.
Farley's arguments for overturning the bankruptcy judge's
ruling are most charitably described as ill-considered. The
decision rests on the judge's acceptance of Margaret's testi-
mony as credible. Credibility determinations are almost
never disturbed on appeal. Farley gives us no good reason to
do so here.

## I. Background

Bart Kempff, an attorney, was general counsel for a luxu-
ry home builder in suburban Chicago. Over time he embez-
zled approximately $1.2 million from his employer. In early
August 2007, he launched a desperate scheme to avoid
detection by surreptitiously replenishing the stolen money.
To that end he asked Brian Farley, also an attorney, to lend
him $400,000, ostensibly for a real-estate development. In

exchange Bart offered Farley a security interest on the real-estate project and a second mortgage on the home he and Margaret owned. Farley agreed.

On August 8 Bart signed a note and mortgage, and Farley wrote him a check for $400,000. Bart had concealed his fraudulent activity from his wife, so Margaret wasn't present for this transaction. Bart assured Farley that she was willing to sign and promised to obtain her signature on the loan documents. He then used the money to partially restore the stolen funds. On August 21 Bart and Margaret closed on a bank loan secured by a second mortgage on their home. Two days later, Bart forged Margaret's signature on the Farley loan documents and sent them back to Farley, clearing the way for him to record the mortgage. Farley did so, but by then it was third in order of priority.

While all this was unfolding, Bart's employer learned of the embezzlement. On August 21—the same day he and Margaret closed on the bank loan—Bart was fired. Things unraveled quickly after that. Several of Margaret's relatives loaned the couple sizable sums in the hope that Bart could repay his employer and avoid prosecution. To no avail; the State's Attorney charged him with felony theft, and he was eventually convicted and disbarred. Meanwhile, the lender holding the first mortgage on the couple's home initiated foreclosure proceedings. Farley filed a cross-claim against Bart and Margaret in the foreclosure action, but the proceeds of the home sale were insufficient to cover even the first mortgage. The nonpriority lienholders received nothing.[1]

---

[1] Farley obtained an $840,000 judgment against Bart for breach of contract and fraud.

While the foreclosure action was pending, Margaret filed a petition for bankruptcy, which automatically stayed Farley's claim against her. Farley turned to the bankruptcy court for relief, filing an adversary action challenging Margaret's eligibility for a Chapter 7 discharge. He raised many grounds; only two remain relevant here. Farley accused Margaret of transferring property "with intent to hinder, delay, or defraud a creditor" after the date of her bankruptcy petition. 11 U.S.C. § 727(a)(2). He also alleged that she "knowingly and fraudulently" made false statements in her bankruptcy filings. *Id.* § 727(a)(4).

The bankruptcy judge held a three-day bench trial on Farley's claims. Margaret testified that she did not authorize the postpetition transfer and that the inaccurate statements in her bankruptcy filings were innocent mistakes or misunderstandings. The judge credited her testimony, found that she lacked fraudulent intent, and rejected Farley's claims. The district court upheld this ruling, and Farley has appealed.

## II. Discussion

Discharge under Chapter 7 of the Bankruptcy Code "is reserved for the 'honest but unfortunate debtor.'" *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (quoting *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)). Section 727(a) enforces this reservation by "deny[ing] the privilege of discharge to dishonest debtors." *Id.* The statute lists 12 grounds for denying a discharge. 11 U.S.C. § 727(a)(1)–(12). The challenger must establish the debtor's ineligibility by a preponderance of the evidence. *Stamat*, 635 F.3d at 978.

On appeal from a district court's review of a bankruptcy judge's ruling, "we apply the same standard as the district court, reviewing the bankruptcy court's factual findings for clear error and the legal conclusions of both the bankruptcy court and the district court de novo." *In re Marcus-Rehtmeyer*, 784 F.3d 430, 436 (7th Cir. 2015). A factual finding is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Kovacs v. United States*, 614 F.3d 666, 672 (7th Cir. 2010) (quotation marks omitted).

## A. Fraudulent Transfer

A bankruptcy judge may deny a discharge if, after the date of the bankruptcy petition, the debtor transferred or permitted to be transferred any property of the bankruptcy estate "with intent to hinder, delay, or defraud a creditor." § 727(a)(2). Farley alleged that Margaret fraudulently permitted her accountant to transfer funds to the Illinois Department of Revenue for unpaid taxes.

The tax payment concerned shares Margaret owned in Steel Investment Company, a closely held company controlled primarily by relatives on her mother's side. Prior to her bankruptcy filing, the Illinois Department of Revenue issued a $7,288.22 levy for unpaid taxes on income from these shares. By the time of the levy, Margaret had pledged the shares to her uncle as security for a loan; she had also ceded control over any income generated by the shares to her father in return for the financial support her parents were providing to her and her children. After she filed her Chapter 7 petition, her bankruptcy attorney prepared a letter informing interested parties that the automatic stay prevent-

ed the Department of Revenue from enforcing the levy. The letter was sent to the Department and to Richard Schoon, Margaret's accountant, who was also the accountant for Steel Investment Company. When Steel Investment later approved a distribution to stockholders, Schoon consulted with the company's attorney and, despite the contrary instructions from Margaret's attorney, transferred a $7,200 distribution on Margaret's stock to the Illinois Department of Revenue.

The bankruptcy judge accepted Margaret's testimony that this transfer occurred without her knowledge, input, or approval. Because § 727(a)(2) requires a knowing fraudulent transfer, the judge held that this payment did not disqualify Margaret from receiving a discharge.

Farley doesn't challenge the judge's factual findings; he argues instead that § 727(a)(2) contains no requirement that the complaining creditor actually suffer harm. *In re Krehl*, 86 F.3d 737, 744 n.4 (7th Cir. 1996) (A "discharge may be denied even if creditors did not suffer any harm."). That's true, but irrelevant. Discharge is not denied unless the complaining creditor "demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor, … [and] intent to defraud must be actual and cannot be constructive." *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002) (citations omitted). Farley has not argued that Margaret purposely kept herself in the dark while suspecting that her accountant would transfer assets to a favored creditor. Nor could he; the uncontested facts tell a different story. Margaret notified Schoon of the bankruptcy stay and informed him that the Department of Revenue could not enforce the levy. After she

did so, she had no reason to think that he would transfer assets to pay the tax debt. Farley has given us no reason to upset the judge's ruling.

## B. Fraudulent Filings

Farley's other challenges fall under the rubric of § 727(a)(4), which withdraws discharge eligibility if the debtor "knowingly and fraudulently" makes "a false oath or account" in connection with the bankruptcy proceeding. A party who opposes discharge under this provision must prove the following: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat*, 635 F.3d at 978. Although Margaret's bankruptcy filings contained several misstatements, the bankruptcy judge found that Margaret lacked fraudulent intent.[2]

Fraudulent intent "includes intending to deceive, which need not connote intending to obtain a pecuniary benefit." *In re Katsman*, 771 F.3d 1048, 1050 (7th Cir. 2014) (internal quotation marks and alteration omitted). Evidence of "reckless disregard for the truth is sufficient to prove fraudulent intent." *Stamat*, 635 F.3d at 982. "Whether a debtor possessed the requisite intent to defraud is a question of fact, which is subject to the 'clearly erroneous' standard of review." *In re Marcus-Rehtmeyer*, 784 F.3d at 436. And because an "intent determination often will depend upon a bankruptcy court's

---

[2] The bankruptcy judge also concluded that some of the inaccuracies were immaterial. Farley challenges this ruling, but we do not need to address it.

assessment of the debtor's credibility," the reviewing court's deference to the bankruptcy judge's ruling is particularly strong in this context. *In re Krehl*, 86 F.3d at 743 (addressing a challenge to discharge under § 727(a)(2)).

Margaret testified that each misstatement in her bankruptcy filings was an innocent mistake. The judge found her testimony "very credible" and concluded that the errors resulted from either a misunderstanding or the "utter incompetence" of Margaret's attorney, not any fraudulent intent on her part. Farley carries a heavy burden to convince us otherwise.

The first misstatement relates to the Kempffs' divorce settlement. In her original Schedule B, which listed her personal property, Margaret checked "None" next to the space reserved for "[a]limony, maintenance, support, and property settlements to which the debtor is or may be entitled." In an examination conducted under Rule 2004 of the Federal Rules of Bankruptcy Procedure, Margaret admitted that this statement was wrong: Bart technically owes her more than $300,000 under various provisions of their divorce settlement agreement.[3] She filed an amended Schedule B about a week after this examination. Again she checked "None" in this box. But in the space reserved for "[o]ther contingent and unliquidated claims," she explained that she had "[c]laims against ex-husband Bart Kempff, pursuant to Judgment of Marriage Dissolution" and estimated that these claims were worth "0.00."

---

[3] The settlement also requires Bart to indemnify Margaret for marital debts, including debts to her parents.

At trial Margaret testified that she did not include the divorce settlement in her original filing because Bart hadn't paid her anything and she had no expectation that he would ever do so. The judge credited this testimony, considering it eminently reasonable for Margaret to believe that the settlement agreement with her ex-husband—a disbarred, felonious fraudster who has yet to pay her "one cent" of the amount he owes—was essentially worthless. The judge concluded that although Margaret should have disclosed the settlement in her original filing, she did not omit this information with fraudulent intent.

The second misstatement was a line item in Margaret's amended Schedule F listing her creditors. On this form she listed her parents as creditors in the amount of $1.4 million. Farley claims this statement was willfully false because Margaret knew that her parents didn't have the legal authority to collect on this debt; it was at most a moral obligation, not a legal debt. The bankruptcy judge discerned no fraudulent intent on Margaret's part, concluding instead that this line item was the result of "the inexplicable and I will say incompetent advice of [her bankruptcy attorney]."

The third misstatement relates to Margaret's estimates of the value of her clothing and jewelry. In her original and amended Schedule B, she valued this property at $500. At trial Farley tried to prove—largely via Bart's testimony—that Margaret's clothing and jewelry were worth much more than $500. The bankruptcy judge rejected Bart's testimony as self-serving, unreliable, and generally incredible; the rest of Farley's evidence was unsubstantiated or irrelevant. With no credible evidence about the actual value of Margaret's clothing and jewelry, the judge found that Farley had failed

to prove that her estimate was false, much less intentionally and fraudulently so.

The fourth misstatement pertains to Margaret's estimate of her current income in Schedule I. She originally reported $2,000 in monthly income in the form of gifts from her parents, who were supporting Margaret and her children during this period. The bankruptcy judge concluded that the actual amount was closer to $4,500 per month. But again the judge concluded that Margaret's lower estimate was an innocent mistake. The difference ($2,500 per month) reflected charges Margaret made on her parents' credit cards, and a reasonable layperson "would not necessarily think that charges made on somebody else's charge card should be included as income." The judge also noted that Margaret would have no motive to intentionally understate the gifts from her parents because the accurate $4,500-per-month figure "would not have put her anywhere close to the level at which … there could be even a potential argument that she should not get a discharge."

On this point Farley lodged a further objection: Margaret never filed an amended Schedule I correcting this misstatement. The judge attributed the omission to Margaret's attorney, whose "failure to suggest the amendments … reflect[ed] a misunderstanding by him of what should be included … or utter incompetence in not realizing that any errors in the schedules should be corrected." Once again, the judge found that Margaret lacked fraudulent intent.

The fifth and final misstatement is an item in Margaret's amended Statement of Financial Affairs reporting payments made to inside creditors in the year before the bankruptcy petition. Margaret reported a $275.35 payment to her par-

ents; the correct figure was $3,275.35. The judge chalked this up to a simple typographical error, not a fraudulent falsification. The judge also noted that the payment was made more than a year before Margaret's bankruptcy petition and thus did not need to be reported in the first place.

Farley challenges each of these rulings as clear error but offers nothing to contradict the judge's findings. Instead he points to several cases in which we upheld the denial of discharge where the bankruptcy judge made specific findings that the debtor fraudulently falsified submissions to the bankruptcy court. *See, e.g., Stamat*, 635 F.3d 974; *In re Chavin*, 150 F.3d 726 (7th Cir. 1998); *In re Krehl*, 86 F.3d 737; *In re Yonikus*, 974 F.2d 901 (7th Cir. 1992). These decisions cannot possibly help his case; here the bankruptcy judge uniformly found that Margaret lacked fraudulent intent. Farley also relies on *In re Katsman* and *In re Marcus-Rehtmeyer*, but these cases are no more helpful to him; in both cases the bankruptcy judge committed *legal* not *factual* error.

*Katsman* involved a debtor who admitted that she deliberately omitted four creditors from her bankruptcy filings. 771 F.3d at 1049. The bankruptcy judge concluded that the debtor lacked fraudulent intent because she was not motivated by pecuniary interest. *Id.* at 1050. That was a legal mistake. Fraudulent intent in this context requires intent to deceive, but the particular reason for the deception is irrelevant. *Id.* The judge here did not make a similar legal mistake.

*Marcus-Rehtmeyer* is not merely irrelevant; it actually *undercuts* Farley's position. In that case the bankruptcy judge accepted the debtor's explanations for discrepancies in her filings. We expressed some doubt about this credibility finding but accorded it deference anyway. 784 F.3d at 436–

37. In the end we reversed the bankruptcy court's ruling, but not because we found clear error in the judge's factual findings. Rather, we held that the judge misunderstood the debtor's disclosure obligations under state law. *Id.* at 438.

Our willingness to give the benefit of the doubt to a questionable credibility determination in *Marcus-Rehtmeyer* underscores the fatal flaw in Farley's arguments. Farley insists that Margaret's misstatements taken together evince reckless disregard for the truth. But her misstatements can just as easily be attributed to simple negligence or innocent misunderstandings—by Margaret herself or by her attorney. So the bankruptcy judge held. Margaret's explanations were not so self-evidently absurd or in tension with other evidence as to call that credibility finding into question.

## C. "Advice of Counsel" Defense

Finally, Farley raises a single claim of legal error. He maintains that the bankruptcy judge should not have allowed Margaret to testify about the advice she received from her attorney. This argument rests on Rule 8(c) of the Federal Rules of Civil Procedure, which requires that a responsive pleading "affirmatively state any avoidance or affirmative defense." Farley insists that Margaret's testimony amounted to an "advice of counsel" affirmative defense in violation of Rule 8(c).

There's absolutely no support for this argument. Farley had the burden of proof. Margaret was permitted to offer evidence to rebut his claim that she made a fraudulent transfer and filed false schedules in the bankruptcy proceeding with intent to defraud a creditor. A debtor's testimony about advice from her bankruptcy attorney is one kind of

evidence that may tend to negate fraudulent intent. *See In re Gotwald*, 488 B.R. 854, 872 (Bankr. E.D. Pa. 2013). Margaret's testimony about her attorney's advice was not a disguised affirmative defense. Rule 8(c) does not apply.

AFFIRMED.