In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2809

MARILYN O. MARSHALL,

*Trustee-Appellant,*

*v.*

DENISE L. BLAKE,

*Debtor-Appellee.*

Appeal from the United States Bankruptcy Court for the
Northern District of Illinois, Eastern Division.
No. 16-22368 — **Deborah L. Thorne**, *Judge.*

ARGUED FEBRUARY 15, 2018 — DECIDED MARCH 22, 2018

Before BAUER, FLAUM, and MANION, *Circuit Judges.*

FLAUM, *Circuit Judge*. Appellee Denise L. Blake is a below-median income debtor who filed for Chapter 13 bankruptcy. In her proposed bankruptcy plan, Blake sought to retain her annual earned income tax credit and a portion of her tax over-withholdings. Trustee Marilyn O. Marshall objected to confirmation of Blake's plan, arguing that Blake is required to turn over her entire tax refund for use as additional plan pay-

ments. The bankruptcy court confirmed the plan over Marshall's objection. In doing so, it agreed with Marshall that tax credits are income under the Bankruptcy Code that must be taken into account when calculating the debtor's projected disposable income for plan payments. However, the bankruptcy court held that Blake could retain her tax refund if she prorated it as monthly income and offset it with reasonably necessary expenses to be incurred throughout the year. The bankruptcy court certified the case for direct appeal to this court. For the reasons below, we affirm.

## I. Background

### A. Blake's Income, Expenses, and Bankruptcy Plan

Blake is a single mother who lives in subsidized housing with her three dependent children. She has worked as a security officer for more than six years. As a low-income wage earner, Blake consistently qualifies to receive the earned income tax credit.

On July 12, 2016, Blake filed for bankruptcy under Chapter 13. According to her Form 122C-1, Blake's current monthly income ("CMI") is $2,512, or $30,144 annually.[1] This falls well below the median income in Illinois for a household of four, which is $86,921 annually. When calculating her monthly income on her Schedule I,[2] Blake included a pro-rata share of

---

[1] CMI is the debtor's average monthly income during the six-month "look-back" period before they filed their bankruptcy petition. The Form 122-C is used to determine whether a debtor's income is above-median or below-median and which commitment period is required.

[2] Schedule I requires the debtor to report gross monthly income from all sources. The income listed on Schedule I is not the same as a debtor's

her anticipated earned income tax credit for the following year in the amount of $168.50. Blake also filed a Schedule J[3] listing her ongoing monthly expenses. After subtracting payroll deductions and expenses from her monthly income, Blake was left with $119.91 of disposable income each month to make plan payments to her creditors.

On July 26, 2016, Blake filed her original Chapter 13 plan, which proposed monthly plan payments of $119 for thirty-six months, for a total of $4,284. Her plan also included the following provision:

> For each year that the case is pending, Debtor will submit a copy of her federal income tax return to the Trustee by April 30 of each year. Debtor shall tender to the trustee the amount of any federal tax refund within 14 calendar days of receipt, except that Debtor shall be permitted to keep the amount of any earned income tax credit. For tax year 2016, Debtor shall tender to the trustee (1/2) of any federal tax refund within 14 days, excluding the earned income tax credit.

On September 8, 2016, the trustee filed a motion to dismiss Blake's case for failing to correctly list her income and expenses and failing to confirm her plan in a timely manner. A

---

CMI because (1) it includes income from sources like social security benefits, which are expressly excluded from CMI, and (2) it does not reflect an average of the debtor's gross income during the six months before the petition date. *See In re Morales*, 563 B.R. 867, 870, n.2 (Bankr. N.D. Ill. 2017).

[3] Schedule J requires debtors to estimate their monthly expenses for themselves and their dependents as of the date they file for bankruptcy.

week later, Blake filed an amended Schedule I to reflect a decrease in her income due to fewer overtime hours. She also filed an amended Schedule J. After these amendments, Blake's monthly disposable income for plan payments was $74.75. She proposed a new plan under which she would pay the trustee $119 for two months and then $74 for forty-eight months, for a total of $3,790.

## B. Trustee's Objection and Bankruptcy Court's Memorandum Order

On January 20, 2017, the trustee objected to confirmation of Blake's plan. Specifically, the trustee argued that Blake was not committing all of her projected disposable income to the plan because she was retaining her tax refund. The trustee argued that the entire tax refund should be turned over to the trustee to be used for additional plan payments. In response, Blake asserted that she should be allowed to keep the earned income tax credit because it does not count as income under the Bankruptcy Code. The bankruptcy court consolidated Blake's case with two other cases to consider the issue of whether a debtor may retain some or all of a tax refund that includes tax credits.

On March 16, 2017, the bankruptcy court issued a memorandum order overruling the trustee's objection. The court explained that the portion of a tax refund attributable to over-withholdings is automatically included in the debtor's income because it is calculated using a debtor's gross income prior to tax withholding. In addition, the court held that tax credits are also considered income under the Bankruptcy Code. Thus, the court required Blake to include a prorated version of her annual tax credit as monthly income on her Schedule I (i.e., the annual tax credit divided by twelve months). At the

same time, however, the court allowed Blake to offset that additional income by adding monthly prorated versions of reasonably necessary expenses to be incurred throughout the year on her Schedule J. In effect, this allowed Blake to retain some, or even all, of her tax credit. The court stated that as long as the offsetting expenses were reasonably necessary, it would confirm Blake's plan without requiring payment of expected tax credits.

### C.  Blake's Amended Schedules and Bankruptcy Plan

Pursuant to the bankruptcy court's order, Blake filed amended schedules on April 4, 2017. In her amended Schedule I, Blake increased her prorated earned income tax credit from $168.50 per month to $311 per month. In addition, Blake added prorated monthly tax over-withholdings of $100.[4] In her amended Schedule J, Blake added the following monthly prorated expenses: $132 for medical and dental expenses; $40 for shoes and clothing for her two sons (down from $85); $104 for new beds and furniture for her sons; and $43 for graduation expenses for her sons (including a school trip and prom). Once these expenses were deducted from her income, Blake had $102 in disposable income each month to make plan payments.

Blake then filed an amended bankruptcy plan. Her new plan proposed making payments to the trustee of $119 for two

---

[4] Blake estimated these amounts based on her 2015 tax refund, in which she received an earned income tax credit of $4,050 and tax over-withholdings of $2,661. However, she noted that she expected her earned income tax credit to be reduced in coming years due to the age and student status of her qualifying dependents.

months, $74 for seven months, and $102 for fifty-one months, for a total of $5,958.[5]

### D. The Bankruptcy Court's Confirmation Order

On May 3, 2017, the bankruptcy court held a hearing on the confirmation of Blake's plan. During the hearing, Blake's counsel explained that the monthly prorated furniture expense was necessary because Blake's two nineteen-year-old sons had previously been sleeping on air mattresses, their bed frames and mattresses are in "incredibly poor condition," and they do not have any dressers. The court noted that "[i]t's a pretty skinny budget overall." The trustee again objected to confirmation. The court overruled the trustee's objection, stating:

> I think the kids are entitled to sleep on beds that aren't falling apart. And I think that overall the budget as proposed is pretty skimpy and thin. So I think prorating these will be in the best interest of the estate, the best interest of the debtor in terms of hopefully having a plan that actually

---

[5] On April 27, 2017, Blake filed another amended plan solely to add the following language regarding future income tax returns:

> On or before April 20th of the year following the filing of the case and each year thereafter, Debtor shall submit a copy of the prior year's filed federal tax return to the Chapter 13 trustee. Debtor shall be permitted to retain any tax refund (including EITC) up to $4,942. Debtor shall tender to the Trustee the amount of any tax refund in excess of $4,942. Payment of any tax refund (as applicable) to the Trustee shall be treated as additional payment into the plan and must be submitted with 7 (seven) days of receipt of such refund by the Debtor.

> at the end of the day she can get a discharge.
> And, meanwhile, creditors will be getting a lit-
> tle.

On the same day, the bankruptcy court entered an order con-
firming Blake's plan.

### E. Motion for Certification For Direct Appeal

On May 16, 2017, the trustee filed a notice appealing the
bankruptcy court's confirmation order. At the same time, the
trustee filed a motion to certify the order for direct appeal to
this Court. On June 15, 2017, Blake filed her objection to the
certification motion.

On July 5, 2017, the bankruptcy court denied the certifica-
tion motion without prejudice. The bankruptcy court held
that that, because more than thirty days had passed since the
notice of appeal was filed, the matter was no longer "pend-
ing" in the bankruptcy court, but rather in the district court.
As a result, the bankruptcy court concluded that, under Fed-
eral Rule of Bankruptcy Procedure 8006(b), it lacked power to
certify the order for direct appeal. However, the bankruptcy
court noted that if the district court remanded the case, it was
prepared to enter an order certifying the case for direct ap-
peal. On July 27, 2017, the district court remanded the case to
the bankruptcy court for further proceedings.

On August 28, 2017, the bankruptcy court entered an or-
der certifying the case for direct appeal to this Court. The
court determined that certification was appropriate because
there is no controlling decision from the Supreme Court or the
Seventh Circuit as to whether tax credits are disposable in-
come under the Bankruptcy Code. We subsequently author-
ized a direct appeal.

## II. Discussion

We review questions of our jurisdiction de novo. *Muratoski v. Holder*, 622 F.3d 824, 829 (7th Cir. 2010). "We review the bankruptcy court's conclusions of law de novo and its factual findings for clear error." *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011).

### A. Jurisdiction

As a threshold issue, Blake argues we lack jurisdiction to hear this direct appeal because: (1) this case does not actually involve the legal question certified for direct appeal; (2) the trustee failed to file a petition for permission to appeal as required by Federal Rule of Appellate Procedure 5; and (3) the bankruptcy court lacked authority to certify the direct appeal because it did not do so within the time limit in Federal Rule of Bankruptcy Procedure 8006(f). These arguments fail.

### 1. *This Case Involves the Legal Question Certified for Direct Appeal*

We have jurisdiction to hear direct appeals "if the bankruptcy court … certif[ies] that … the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States … and if the court of appeals authorizes the direct appeal." 28 U.S.C. § 158(d)(2)(A)(i); *see also, e.g.*, *In re Pajian*, 785 F.3d 1161, 1162 (7th Cir. 2015). Here, the bankruptcy court certified the confirmation order for direct appeal under that provision and we subsequently authorized the direct appeal.

Nevertheless, Blake maintains that we lack jurisdiction to review the confirmation order. Blake initially argued that her

earned income tax credit was not income under the Bankruptcy Code, but the bankruptcy court rejected that argument in its March 2017 memorandum order. As a result, Blake included her earned income tax credit as income in her amended Chapter 13 plan. Therefore, Blake argues that, by the time her plan was confirmed in May 2017, this case no longer "involved" the legal question that the bankruptcy court certified for direct appeal.

Blake's argument fails for two reasons. First, our jurisdiction under § 158(d)(2)(A) turns on whether the bankruptcy court certified that the order involves a question of law that warrants a direct appeal. In other words, under § 158(d)(2)(A), the bankruptcy court gets to determine which legal questions are implicated by its own orders and whether those legal questions warrant certification. Given the bankruptcy court's familiarity with its own orders, it is in the best position to make this determination. Here, by granting certification, the bankruptcy court implicitly determined that its confirmation order involved the legal question of whether Blake's earned income tax credit was income under the Bankruptcy Code.

Second, to the extent we get to weigh in on whether certification was appropriate by "authoriz[ing] the direct appeal," we agree that the bankruptcy court's order confirming Blake's plan "involves" the legal question certified. 28 U.S.C. § 158(d)(2)(A). Indeed, this legal question was the basis for the trustee's objection to confirmation. The court resolved that question in the trustee's favor and required Blake to file an amended plan that treated her tax credit as income. Once she did so, the court confirmed her plan in accordance with its previous memorandum order. Thus, the order confirming

Blake's Chapter 13 plan inherently involved the legal question of whether her earned income tax credit is income under the Bankruptcy Code.[6]

     2. *The Trustee's Failure to File a Petition for Permission to Appeal Was Harmless*

Federal Rule of Appellate Procedure 5[7] requires a party to file a petition for permission to appeal in the circuit court that includes the legal question presented, the relief sought, the reasons why the appeal should be allowed, a copy of the order appealed, and a copy of the district court's order granting permission to appeal. Fed. R. App. P. 5. We have generally said that the requirements for perfecting an appeal, including those imposed by court rule, "are important and should be complied with." *In re Turner*, 574 F.3d 349, 354 (7th Cir. 2009).

However, we have excused the failure to file a Rule 5 petition if the party filed a timely notice of appeal and "no one is harmed by the failure." *Id.* For example, in *Turner* we found that the trustee's failure to file a petition for leave to appeal was harmless because the appellant-trustee filed a timely notice of appeal and the bankruptcy court clerk transmitted the

---

[6] Although the bankruptcy court certified the confirmation order based on the income classification issue, it acknowledged that this Court "has jurisdiction over the entire certified order." This is evident from the text of § 158, which gives us jurisdiction over "final judgments, orders, and decrees," not just the narrow legal issue certified. 28 U.S.C. § 158(d)(2)(A), (a)(1). In addition, 28 U.S.C. § 1292(b), which is the equivalent of § 158(d) in non-bankruptcy cases, similarly "allows interlocutory appeal of orders—not interlocutory appeal of issues." *N.Y.C. Health & Hosps. Corp. v. Blum*, 678 F.2d 392, 396–97 (2d Cir. 1982).

[7] Rule 5 applies to direct appeals of bankruptcy orders under § 158(d)(2). *See* Fed. R. App. P. 6(c)(1).

certification order to this Court. *See id.* at 351–52. We explained:

> The material that the bankruptcy court transmitted to this court contained everything that the petition for review would have contained …. It contained information concerning the identity of the parties and the order being appealed that the petition would have contained, plus the reasons why this court should grant leave to appeal–for they were the same reasons that the trustee, in the request for certification that he had filed with the bankruptcy court, had presented to that court when it asked that court to certify the case for direct appeal to this court.

*Id.* at 352. In addition, we noted that the appellee-debtor did not oppose the request for certification below in the bankruptcy court, and thus did not "miss[] a chance to oppose a formal petition for review." *Id.* at 354.

Here, as in *Turner*, the trustee's failure to file a separate petition for permission to appeal was harmless. The bankruptcy court clerk transmitted the necessary materials to this Court just ten days after the bankruptcy court issued the certification order, well before the deadline to file a notice of appeal had elapsed. As in *Turner*, these materials contained all the information that a petition for review would have contained.[8] Moreover, although Blake objected to the certification request

---

[8] Specifically, the bankruptcy court clerk transmitted the order being appealed, the notice of appeal, the certification order, and a copy of the entire bankruptcy court docket.

in this case, she filed a brief opposing that request below in the bankruptcy court. Thus, like the appellant in *Turner*, she had an opportunity to challenge our jurisdiction.

> 3. *The Bankruptcy Court Had Authority to Certify The Direct Appeal*

Rule 8006(f) provides that a request to certify for direct appeal under § 158(d)(2)(A) "must be filed with the clerk of the court where the matter is pending within 60 days after the entry of the judgment, order, or decree." Fed. R. Bankr. P. 8006(f)(1). "[A] matter remains pending in the bankruptcy court for 30 days after the effective date … of the first notice of appeal from the judgment, order, or decree for which direct review is sought." *Id.* 8006(b). After that, the matter is pending in the district court. *Id.* "Only the court where the matter is pending … may certify a direct review on request of parties or on its own motion." *Id.* 8006(d).

Here, the trustee filed her notice of appeal and certification request in the bankruptcy court on May 16, 2017. However, the bankruptcy court did not issue a ruling on the request until July 6, 2017. At that point, more than thirty days had elapsed since the notice of appeal was filed. As a result, the matter was no longer "pending" in the bankruptcy court under Rule 8006(b). Accordingly, the bankruptcy court denied the certification request without prejudice. However, the bankruptcy court indicated its intention to grant the certification motion if the district court remanded for that purpose. The district court subsequently remanded the matter back to the bankruptcy court, which then entered the certification order on August 28, 2017. Blake argues that this was an improper end-run around Rule 8006's "crystal-clear" thirty-day deadline.

Blake's argument is unpersuasive. Rule 8008 explicitly states that, "[i]f a party files a timely motion in the bankruptcy court for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the bankruptcy court may … state that the court would grant the motion if the court where the appeal is pending remands for that purpose." Fed. R. Bankr. P. 8008(a)(3). If the bankruptcy court so indicates, "the district court … may remand for further proceedings." *Id.* 8008(c). That is exactly what happened here. This result promotes the purpose of Rule 8006, which is to "give the bankruptcy judge, who will be familiar with the matter being appealed, an opportunity to decide whether certification for direct review is appropriate." Fed. R. Bankr. P. 8006 advisory committee's note to 2014 amendments.

For all these reasons, we have jurisdiction to hear the direct appeal.

## B. Tax Credits Are Income Under the Bankruptcy Code

If the trustee objects to confirmation of the bankruptcy plan, the court may not approve the plan unless the debtor pays all of their "projected disposable income" into the plan during the applicable commitment period.[9] 11 U.S.C. § 1325(b)(1). The Code defines "disposable income" as:

> current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable

---

[9] Because Blake is a below-median income debtor, her applicable commitment period is three years. 11 U.S.C. § 1325(b)(4)(A). However, under Blake's plan, she will pay all of her projected disposable income into the plan for five years—a longer commitment period than required.

nonbankruptcy law to the extent reasonably
necessary to be expended for such child) less
amounts reasonably necessary to be ex-
pended … for the maintenance or support of the
debtor or a dependent of the debtor ….

*Id.* § 1325(b)(2).

In turn, the Code defines "current monthly income" as
"the average monthly income from all sources that the debtor
receives … without regard to whether such income is taxable
income" in the six-month period before the bankruptcy peti-
tion was filed. *Id.* § 101(10A)(A). CMI "includes any amount
paid by any entity other than the debtor … on a regular basis
for the household expenses of the debtor or the debtor's de-
pendents." *Id.*

Bankruptcy courts in this Circuit agree that tax credits are
income under the Bankruptcy Code. *See In re Morales*, 563 B.R.
867, 872 (Bankr. N.D. Ill. 2017); *In re Forbish*, 414 B.R. 400, 403
(Bankr. N.D. Ill. 2009); *In re Royal*, 397 B.R. 88, 94 (Bankr. N.D.
Ill. 2008). These courts have reasoned that the statutory defi-
nition of CMI, which has only a few enumerated exceptions,
is broad enough to encompass tax credits. Moreover, the stat-
ute specifically excludes other sources of revenue—for exam-
ple, social security benefits and payments to victims of war
crimes—but not tax credits. *See* 11 U.S.C. § 101(10A)(B). This
suggests that Congress intended for tax credits to be included
in the income calculation. *See Smith v. Zachary*, 255 F.3d 446,
451 (7th Cir. 2001) ("The general rule of statutory construction
is that the enumeration of specific exclusions from the opera-
tion of a statute is an indication that the statute should apply
to all cases not specifically excluded." (quoting 2A *Sutherland
Statutory Construction* § 47.23)); *Royal*, 397 B.R. at 94 ("Earned

income tax credits were not specifically excluded, which is an indication that they are meant to be included.").

Moreover, the earned income tax credit statute provides that the credit "shall not be treated as income" for the purposes of several other federal statutes that provide public assistance benefits. 26 U.S.C. § 32(l). However, when Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005, it "fail[ed] to amend the earned income tax credit statute to exclude the credit from the definition of current monthly income." *Royal*, 397 B.R. at 94. "The implication is that … Congress intended for [the earned income tax credit] to be *included* in the calculation of income." *Id.* For all these reasons, tax credits must be included in CMI when calculating disposable income.[10]

## C. Below-Median Income Debtors May Prorate Their Annual Income Tax Refund And Associated Expenses

Just because tax credits are included in CMI, however, does not mean the debtor must pay the entire tax credit to the trustee as disposable income. After all, disposable income

---

[10] The bankruptcy court correctly noted that, unlike tax credits, tax over-withholdings do not represent additional income that must be used for plan payments. This is because CMI is calculated from a debtor's gross income prior to tax withholdings. *Forbish*, 414 B.R. at 403 ("CMI is in essence pre-tax gross income."). As a result, CMI "already includes a debtor's wages withheld for taxes, and if a debtor has used his CMI (as he must) in coming up with his plan payments, there should be no need to require him to add in his tax refunds." *Id.*; *see also Morales*, 563 B.R. at 872 ("If debtors account for their expected income and tax expense correctly at the time of confirmation, tax refunds need not be paid as additional plan payments.").

equals CMI minus the "amounts reasonably necessary to be expended … for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2). That brings us to the real issue in this case: how debtors should account for their annual tax refund when calculating their projected disposable income.

The trustee argues that income tax refunds should be turned over to the trustee to make additional plan payments. To the extent a debtor wants to retain some or all of the tax refund for reasonably necessary expenses, the debtor must move to modify the plan under 11 U.S.C. § 1329.

However, several bankruptcy courts in this Circuit have adopted a different practice. *See, e.g.*, *Morales*, 563 B.R. at 872–73; *In re Gibson*, 564 B.R. 608, 610–11 (Bankr. N.D. Ill. 2017). In these cases, bankruptcy courts have allowed below-median income debtors like Blake to account for their annual tax refund before their plan is confirmed. Under this approach, the debtor prorates her annual tax refund (i.e., divides the annual tax refund by twelve) and adds the resulting amount to her CMI. Then, the debtor prorates future expenses that the refund will be spent on over that twelve-month period, thus potentially offsetting the tax refund income as long as her additional expenses are reasonably necessary.[11]

---

[11] Although the bankruptcy court gave below-median income debtors the option to prorate the income and expenses related to their tax return, it did not *require* them to do so. The court made clear in its certification order that it "would not force debtors to prorate their tax-refund related income and expenses if the trustee did not object to another form of treatment in the plan and the parties were in agreement."

The bankruptcy court here adopted this practice for a couple reasons. First, the court wanted to alleviate the burdens that the motion-to-modify process imposes on trustees, debtors' counsel, and the court.[12] Second, the court sought to promote consistency across trustees who often have different practices as to whether a debtor may retain a portion of their tax refund.[13]

The trustee argues that this approach is inconsistent with § 1325(b) of the Bankruptcy Code and the Supreme Court's interpretation of "projected disposable income" in *Hamilton v. Lanning*, 560 U.S. 505 (2010). The trustee also argues that this practice results in plans that are not feasible, accurate, or proposed in good faith as required by § 1325(a). Finally, the trustee contends that this procedure frustrates the legislative purposes of Chapter 13. We disagree.

---

[12] The court explained that below-median income debtors often propose plans with "extremely tight" budgets that do not consider all expenses to be incurred during the commitment period. As a result, when these debtors receive their tax refunds, they move to modify their plans so they can use that money for necessary expenses. In fact, the court noted that, of the 554 motions to modify it received between January 1, 2016 and February 14, 2017, approximately 24% requested retention of tax refunds. Not surprisingly, then, the number of motions to modify increases significantly around tax season. According to the bankruptcy court, the top three reasons for debtors wishing to keep their refunds were car repairs, household expenses, and medical/dental expenses, and the court granted the vast majority of those motions (only 2% were denied).

[13] For example, the trustee in this case requires that debtors turn over the entire tax refund, but two other trustees in the Northern District of Illinois allow debtors to keep $2,000 of their tax refunds and do not try to recover tax credits from low-income debtors.

> *1. The Bankruptcy Court's Holding Is Consistent With § 1325(b) and the Supreme Court's Interpretation Of "Projected Disposable Income"*

Because the trustee objected to the confirmation of Blake's plan, the court could only confirm the plan if it "provide[d] that all of the debtor's *projected disposable income* to be received in the applicable commitment period … will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B) (emphasis added). As explained *supra*, "disposable income" equals CMI minus reasonably necessary expenses. *Id.* § 1325(b)(2). However, the Code does not tell us how to calculate *projected* disposable income.

In *Lanning*, the Supreme Court adopted a "forward-look-ing approach" to the question. 506 U.S. at 509. There, the debtor had received a one-time buyout from her former employer during the six month-period before she filed for bankruptcy, which greatly inflated her CMI calculation. *Id.* at 511. The debtor's plan proposed monthly payments that were more in line with her actual income and ability to pay going forward. *Id.* The trustee objected, arguing that the proper way to calculate projected disposable income was to simply multiply the debtor's past average monthly income by the number of months in the commitment period. *Id.* at 511–13. The Court acknowledged that this "mechanical approach" is appropriate "in most cases." *Id.* at 513. However, it agreed with the debtor that, "in exceptional cases, where significant changes in a debtor's financial circumstances are known or virtually certain, a bankruptcy court has discretion to make an appropriate adjustment." *Id.*

The *Lanning* Court provided several reasons for this flexible approach. First, the Court relied on "the ordinary meaning

of the term 'projected.'" *Id.* at 513. The Court explained that, "[w]hile a projection takes past events into account, adjustments are often made based on other factors that may affect the final outcome." *Id.* at 514. Second, the Court examined how the term "projected" is used in other federal statutes, and found that "Congress rarely has used it to mean simple multiplication." *Id.* Third, the Court reasoned that, if Congress wanted "to mandate simple multiplication," it could have just used the word "multiplied" as it did elsewhere in the Bankruptcy Code. *Id.* at 514–15 (citing 11 U.S.C. §§ 704(b)(2), 707(b)(2), 707(b)(6), (7)(A), 1325(b)(3)). Finally, the Court noted that, prior to BAPCPA, courts multiplied a debtor's CMI by the number of months in the commitment period "as the first step," but "also had discretion to account for known or virtually certain changes in the debtor's income." *Id.* at 515, 517 ("[P]re-BAPCPA bankruptcy practice reflected a widely acknowledged and well-documented view that courts may take into account known or virtually certain changes to debtors' income or expenses when projecting disposable income."). The Court found this pre-BAPCPA bankruptcy practice "telling" because courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Id.* at 517 (quoting *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 454 (2008)). "Congress did not amend the term 'projected disposable income' when it passed BAPCPA in 2005," and thus did not clearly indicate a departure from this historical practice. *Id.*

The *Lanning* Court also found that the trustee's mechanical approach "clashe[d] repeatedly with the terms of 11 U.S.C. § 1325." *Id.* For instance, § 1325(b)(1)(B) states that a bank-

ruptcy court may overrule a trustee's objection to confirma-
tion of a plan if "the plan provides that all of the debtor's pro-
jected disposable income *to be received in the applicable commit-
ment period*" will be used to make payments to unsecured
creditors. 11 U.S.C. § 1325(b)(1)(B) (emphasis added). This ad-
ditional language "strongly favors the forward looking ap-
proach." *Lanning*, 560 U.S. at 517. In addition, "§ 1325(b)(1) di-
rects courts to determine projected disposable income 'as of
the effective date of the plan,' which is the date on which the
plan is confirmed." *Id.* at 518 (quoting 11 U.S.C. § 1325(b)(1)).
The Court explained: "Had Congress intended for projected
disposable income to be nothing more than a multiple of dis-
posable income in all cases, we see no reason why Congress
would not have required courts to determine that value as of
the *filing* date of the plan." *Id.* Therefore, this language is also
"more consistent with the view that Congress expected courts
to consider postfiling information about the debtor's financial
circumstances." *Id.*

As a practical matter, the *Lanning* Court noted that the
trustee's approach "would produce senseless results" in cases
where "a debtor's disposable income during the 6-month
look-back period is either substantially lower or higher than
the debtor's disposable income during the plan period." *Id.* at
520. If a debtor's income is unusually high during the look-
back period, the debtor will not be able to make plan pay-
ments and thus will be denied Chapter 13 protection. *Id.* at
520–21. Conversely, if the debtor's income is unusually low
during the look-back period, "the mechanical approach
would deny creditors payments that the debtor could easily
make." *Id.* at 520. For all these reasons, the Court ultimately
held that, "when a bankruptcy court calculates a debtor's pro-
jected disposable income, the court may account for changes

in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Id.* at 524.

The trustee points out that Blake is a below-median income debtor, whereas the debtor in *Lanning* was an above-median income debtor. Although the Bankruptcy Code treats these two kinds of debtors differently in at least one respect,[14] the trustee fails to explain why *Lanning*'s holding would not apply equally to below-median income debtors. As the trustee herself acknowledges, this case is similar to *Lanning* in that Blake's CMI during the six-month look-back period did not accurately represent her post-confirmation income. Thus, the *Lanning* Court's reasoning applies with equal force to below-median income debtors.

Here, the bankruptcy court properly followed *Lanning* to calculate Blake's projected disposable income. Although Blake did not receive a tax refund during her six-month look-back period, it is virtually certain that she will be entitled to an earned income tax credit each year during her commitment period. The earned income tax credit statute provides a re-fundable credit as a percentage of every dollar earned, and the percentage received depends on the number of qualifying

---

[14] "[T]he disposable income calculation under § 1325(b)(2) for below-median debtors differs slightly from the calculation for above-median debtors." *In re Brooks*, 784 F.3d 380, 384 n.3 (7th Cir. 2015). BAPCPA adopted the standardized means test for above-median debtors. *Id.* at 385. Under that test, many of an above-median income debtor's major expenses, such as housing, utilities, food, and transportation are based upon IRS standards. *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 66 & n.2 (2011). In contrast, below-median income debtors "must prove on a case-by-case basis that each claimed expense is reasonably necessary." *Id.* at 71 n.5.

children. *See* 26 U.S.C. § 32. Due to her income level, Blake is virtually certain to receive the earned income tax credit each year. As a result, her CMI during the look-back period understated her actual disposable income during the plan period. Accordingly, the bankruptcy court had discretion to consider the tax credit when calculating Blake's projected disposable income. Other bankruptcy courts in this Circuit have reached the same conclusion. *See, e.g.*, *Morales*, 563 B.R. at 871 (holding that debtor's future receipt of earned income credit, child tax credit, and educational credit should be included when calculating projected disposable income); *In re Gibson*, 564 B.R. at 611–12 (same). Indeed, this is exactly the kind of forward-looking approach that the Supreme Court endorsed in *Lanning*.

The trustee argues that this calculation of Blake's projected disposable income is "illusory" and "divorced from reality." Of course, it is possible that Blake's tax refund income might vary during the commitment period. For example, Blake might have another qualifying child, which would increase her earned income tax credit. Alternatively, her earned income tax credit might decrease due to the age and student status of her dependents. However, § 1325(b) does not require a debtor to pay all possible or actual future disposable income to the trustee. *See In re Gibson*, 564 B.R. at 612. Rather, it requires the debtor to commit all "*projected* disposable income." 11 U.S.C. § 1325(b)(1)(B) (emphasis added). Given the forward-looking nature of this analysis, there is always a risk that the debtor's projected disposable income will not match up perfectly with the debtor's actual disposable income. To arrive at a reasonably accurate estimate, *Lanning* instructs courts to look to historical practice and then make adjust-

ments based on known or virtually certain information regarding the debtor's income or expenses. Here, the bankruptcy court followed that guidance. This projected income is no more "illusory" or "divorced from reality" than Blake's earned income from her regular employment, which could also change during the commitment period. Moreover, in the event Blake's earned income tax credit increases in future years, her plan requires her to turn over to the trustee any portion of her tax refund that exceeds the amount already included in her projected disposable income.

Next, the trustee argues that, "because the funds are received annually and not on a monthly basis," prorating the annual tax refund in this way artificially inflates the debtor's income. However, the Code's definition of "current monthly income" is not limited to income that is received on a monthly basis.[15] Rather, the Code defines CMI as "the *average* monthly income from all sources that the debtor receives" during the six-month look-back period.[16] 11 U.S.C. § 101(10A) (emphasis added). This language requires debtors to average (i.e., prorate) all of their income—regardless of how regularly it is received. *See Gibson*, 564 B.R. at 610 ("CMI includes all income …, whether received weekly, monthly, annually, or on

---

[15] Indeed, if it were, an annual tax refund would not even be included in CMI. Accordingly, this argument is in tension with the trustee's argument that an annual tax refund must be included in CMI.

[16] Again, although Blake did not receive her tax refund within the six-month look-back period, the Supreme Court made clear in *Lanning* that courts may consider changes in the debtor's income and expenses that are known or virtually certain to occur during the applicable commitment period, even if they differ from income or expenses during the look-back period.

an irregular basis."). The bankruptcy forms and instruction manual similarly tell debtors to prorate any income that is not received on a monthly basis. *See Morales*, 563 B.R. at 873 (citing Official Form 106I and Instructions: Bankruptcy Forms for Individuals 26 (Rev. Apr. 2016)).[17] In addition, CMI is defined to "include[] any amount paid by any entity other than the debtor … *on a regular basis* for the household expenses of the debtor or the debtor's dependents." 11 U.S.C. § 101(10A)(B) (emphasis added). As the trustee acknowledges, tax refunds from the IRS meet this definition because they are paid on a regular basis (annually) for household expenses. For all these reasons, Blake's income tax refund qualifies as income that must be included in CMI even though it is not received in monthly installments, but rather as an annual lump sum. Thus, the court correctly allowed Blake to include a prorated version of her annual tax refund in her CMI when calculating her projected disposable income.

The trustee's real complaint is not that the court allowed Blake to prorate her annual tax refund as monthly income. After all, the trustee wants to use that additional income for plan payments. Rather, the trustee objects to the court's approach because it allows Blake to deduct reasonable expenses, thus potentially negating the amount that could otherwise be used to make plan payments.

But the statutory language and the *Lanning* decision support the bankruptcy court's approach on the other side of the ledger as well. To calculate disposable income, "Chapter 13

---

[17] The trustee argues that, "[w]here the language of the Code is at odds with the form," the statute prevails. However, in this case, the statutory text and the official forms do not conflict. To the contrary, both require proration. Thus, we need not choose between them.

utilizes a multi-part equation, containing both an income component and an expense component." *In re Brooks*, 784 F.3d 380, 383 (7th Cir. 2015). Specifically, a debtor must subtract from her CMI "amounts reasonably necessary to be expended … for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2). Thus, the bankruptcy court properly allowed Blake to deduct reasonably necessary expenses from her income tax refund. Indeed, as another bankruptcy court in this Circuit noted, "the trustee's approach eliminates entirely the 'expenses' component from the statutory formula for plan payments … when the income is received annually." *Morales*, 563 B.R. at 873. If Blake expected to receive this additional income in the form of biweekly wages, rather than an annual tax refund, no one would question her ability to deduct reasonably necessary expenses from it when calculating her projected disposable income. *See id.* at 874. The trustee provides no persuasive reason to treat the income differently simply because she receives it in the form of a tax refund once a year.

Moreover, because we are dealing with *projected* disposable income, *Lanning* gives bankruptcy courts discretion "in unusual cases" to "go further and take into account other known or virtually certain information about the debtor's future income *or expenses*." 560 U.S. at 519 (emphasis added). The bankruptcy court in this case noted that below-median income debtors like Blake have "extremely tight" budgets that "do not consider all the commonly incurred expenses during the applicable commitment period." As a result, these debtors often rely on their annual tax refund as "a poor person's savings account." In other words, the court determined that Blake's expenses during the look-back period did not ac-

curately reflect all of the expenses that she would actually incur during the commitment period. Thus, the court properly exercised its discretion to allow Blake to prorate reasonably necessary expenses that would be incurred throughout the year.[18]

The trustee does not argue that Blake's prorated expenses were not reasonably necessary. Instead, she argues that they "do not actually exist at the time the schedules are filed," and debtors "cannot demonstrate that they will actually spend the refunds on that expense." She asserts that Blake must provide evidence "demonstrating a historical practice of spending her refund on these exact same expenses every year."

These arguments fail for two reasons. First, § 1325(b)(2) says nothing of "actual" expenses; it merely describes "amounts *reasonably necessary* to be expended … for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2) (emphasis added). Notably, several other provisions of the Bankruptcy Code use the word "actual" when describing expenses. *See, e.g.,* 11 U.S.C. §§ 330(a)(1)(B) (allowing a court to award the trustee "reimbursement for actual, necessary expenses"), 1329(a)(4) (allowing for modification of the plan after confirmation to reduce payments "by the actual amount expended by the debtor to purchase health insurance"). Accordingly, we must presume

---

[18] Other bankruptcy courts in this Circuit have done the same. For example, in *Royal*, the court noted that the debtor had an "extremely tight" budget and "strongly suspect[ed] that [the debtor] defer[red] certain expenses, those that [could] wait until she receive[d] her yearly earned income tax credit." 397 B.R. at 100. Preferring "to make decisions that [were] grounded in reality," that court allowed the debtor to file an amended expense schedule to offset the additional income in her tax refund. *Id.*

Congress acted intentionally by omitting the word "actual" when describing the kinds of expenses that debtors may deduct from their CMI when calculating projected disposable income. *See BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 537 (1994) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.") (alteration in original) (quoting *Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994))).

Second, the trustee's argument is just another version of the rigid mechanical approach the Supreme Court rejected in *Lanning*. Historical practice is not dispositive in every case. Thus, the word "projected" implies more than merely multiplying past expenses by the amount of time in the commitment period. *See Lanning*, 560 U.S. at 514 ("While a projection takes past events into account, adjustments are often made based on other factors that may affect the final outcome."); *In re Kibbe*, 361 B.R. 302, 312 n.9 (B.A.P. 1st Cir. 2007) ("The word 'multiplied' is quite different from the word 'projected.' The former requires only mathematical acumen; the latter, mathematic acumen adjusted by deliberation and discretion."). Here, consistent with *Lanning* and the text of § 1325(b)(2), the court made adjustments to Blake's projected disposable income based on known or virtually certain future expenses (e.g., her sons' high school graduation expenses) that were reasonably necessary.

### 2. *The Bankruptcy Court's Holding Is Consistent With The Good Faith Requirement Under § 1325(a)(3)*

Next, the trustee argues that, if debtors are allowed to prorate in this manner to comply with § 1325(b), their schedules

and plans will not comply with the good faith requirement in § 1325(a).

Before the court may confirm a bankruptcy plan, the debtor must also show the requirements in § 1325(a) have been met. Section 1325(a)(3) requires that the plan be "proposed in good faith." 11 U.S.C. § 1325(a)(3). "In considering whether a plan is filed in good faith, the court asks of the debtor: 'Is he really trying to pay the creditors to the reasonable limit of his ability or is he trying to thwart them?'" *In re Smith*, 286 F.3d 461, 466 (7th Cir. 2002) (quoting *In re Schaitz*, 913 F.2d 452, 453 (7th Cir. 1990)). "At base, this inquiry often comes down to a question of whether the filing is fundamentally unfair." *Id.* (quoting *In re Love,* 957 F.2d 1350, 1357 (7th Cir. 1992)). "Whether a plan or petition is filed in good faith is a question of fact based on the totality of the circumstances surrounding the proposed plan." *Id.* Because "[a] bankruptcy court's determination that a plan was filed in good faith is a factual finding," we will only reverse "if the court's finding was clearly erroneous." *Id.* at 465.

The trustee argues that when courts prorate the annual tax refund and associated expenses on a monthly basis, the debtor's expense schedule is "subject to manipulation" in violation of the good faith requirement. The trustee questions the accuracy of Blake's projected expenses in this case, especially because she filed an amended expense schedule four times.

By confirming Blake's plan, the bankruptcy court implicitly found, based on the totality of the circumstances, that her plan was proposed in good faith. Moreover, the trustee never objected to confirmation of Blake's plan in the bankruptcy court on the ground that it was proposed in bad faith, and

does not point to anything in the record on appeal to suggest that Blake was trying to thwart her creditors.

True, Blake amended her expense schedule multiple times. However, Bankruptcy Rule 1009 allows a debtor to amend her schedules "as a matter of course at any time before the case is closed." Fed. R. Bankr. P. 1009(a). This "precludes an inquiry into the Debtor's good faith" based solely on the filing of amended schedules. *In re Padula*, 542 B.R. 753, 760 (Bankr. E.D. Va. 2015), *aff'd*, 651 F. App'x 228 (4th Cir. 2016).

Moreover, the "nature and timing" of Blake's amendments do not suggest bad faith. *Cf. In re Powers*, 554 B.R. 41, 57 (Bankr. N.D.N.Y. 2016). When Blake first amended her Schedule J in September 2016, she reduced the amount of her monthly expense for shoes and clothing from $200 to $85. When Blake next amended her Schedule J in December 2016, she reduced her monthly expense for food and housekeeping from $500 to $400 and her monthly expense for personal care from $40 to $35. By making these reductions in her budget, Blake completely offset the increase in her monthly rent. As a result, the amount of disposable monthly income available to make plan payments to her creditors remained exactly the same. In April 2017, Blake amended her Schedule J again because the bankruptcy court told her to do so in its March 2017 order. In that amendment, Blake added monthly expenses for furniture, medical and dental, as well as graduation expenses. However, she reduced the amount to be spent on clothing and shoes. Similarly, when Blake amended her expense schedule again in May 2017 to add an expense for car repairs, she proportionately reduced her monthly furniture expense. These amendments do not suggest that Blake was trying to "thwart" her creditors. *Smith*, 286 F.3d at 466. To the contrary, Blake

repeatedly reduced her own spending so that her creditors would not take a hit. If anything, these amendments evince a good faith attempt to pay her creditors to the reasonable limit of her ability. Furthermore, the nature of Blake's expenses distinguish this case from the other cases that the trustee relies on. *See, e.g, In re McNichols*, 254 B.R. 422, 431 (Bankr. N.D. Ill. 2000) (concluding that debtor's plan did not meet the good faith requirement because she testified that her spouse still spent $720 for manicures and $1,680 for a housekeeper, which showed that "the Debtor continues to live an opulent lifestyle while paying a relatively small dividend to her unsecured creditors").

The trustee argues that Blake's prior bankruptcy case also demonstrates a lack of good faith. Blake filed a previous bankruptcy case that was dismissed within one year of the filing of this matter due to Blake's failure to make plan payments. As a result, this case was presumed to have been filed in bad faith. 11 U.S.C. § 362(c)(3)(C). To rebut this presumption and extend the automatic bankruptcy stay at the outset of this case, Blake had to provide "clear and convincing evidence" that this case was filed in good faith. *Id.* To that end, Blake submitted a declaration stating that she had suffered a loss in income because one of her children was no longer receiving social security benefits. Blake also agreed to go on "payroll control"—i.e., her monthly payments to the trustee would come directly from her employer—to facilitate making her plan payments. There were no objections to Blake's motion to extend the automatic stay, and the bankruptcy court granted it. Thus, the bankruptcy court implicitly found that the instant case was not filed in bad faith.

Finally, the trustee argues that the bankruptcy court was required to hold an evidentiary hearing so the trustee could cross-examine Blake about the accuracy of her expenses. However, "[n]othing in the statutes or case law requires a hearing every time the issue of good faith is raised in a Chapter 13 proceeding. The bankruptcy court, exercising its sound discretion, is in the best position to determine when an evidentiary hearing on the issue of good faith is necessary." *Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir. 1992). We accordingly defer to the bankruptcy court's judgment that an evidentiary hearing was not necessary.

3. *The Bankruptcy Court's Holding Is Consistent With The Feasibility Requirement in § 1325(a)(6)*

In addition to satisfying the good faith requirement, the debtor's plan must be feasible. *See* 11 U.S.C. § 1325(a)(6) (requiring that the debtor "be able to make all payments under the plan and to comply with the plan"). "To be feasible, the plan must have a reasonable likelihood of success as determined by the particular circumstances of the plan and the case." *In re Olson*, 553 B.R. 343, 348 (Bankr. N.D. Ill. 2016). "While the feasibility requirement is not rigorous, the plan proponent must, at minimum, demonstrate that the Debtor's income exceeds expenses by an amount sufficient to make the payments proposed by the plan." *Id.* (quoting *In re Bernardes,* 267 B.R. 690, 695 (Bankr. D.N.J. 2001)). "Because the issue of feasibility is one of fact, the determination by the bankruptcy court will not be disturbed unless the decision is clearly erroneous." 6 Norton Bankr. L. & Prac. 3d § 112:28.

The trustee argues that, because debtors only receive their tax refund once a year as a lump sum, and not in monthly installments, debtors will not have sufficient cash flow to

make their monthly plan payments. As a result, the trustee claims that prorating the debtor's annual tax refund and associated expenses in this way will necessary result in plans that are not feasible.

This argument fails for two reasons. First, feasibility turns on the "particular circumstances of the plan and the case." *Olson*, 553 B.R. at 348. As a result, per se rules are not appropriate in this context. *See Blackshear*, 531 B.R. at 719 ("The determination of feasibility must be done on a case by case basis and is not subject to per se rules." (quoting 8 Collier on Bankruptcy ¶ 1325.07[1] p. 1325–49)). Here, by confirming Blake's plan, the bankruptcy court implicitly found that Blake would be able to make her payments under the plan, and the trustee points to no reason to think otherwise. *See id.* (holding that bankruptcy court's "implicit conclusion that the plan is feasible" would not be disturbed on appeal to district court).

Second, even if per se rules were appropriate, bankruptcy courts have rejected the trustee's argument that prorating an annual tax refund and associated expenses will automatically render plans unfeasible. *See, e.g., Morales*, 563 B.R. at 874; *Gibson*, 564 B.R. at 612. "If the debtor has reasonable expenses that offset the tax credits, her plan payment will not increase." *Morales*, 563 B.R. at 874. And if expenses do not offset the tax credits, such that the plan payment does increase, "[t]he debtor is free to adjust the timing of payment for expenses so that he can make … plan payments on time." *Gibson*, 564 B.R. at 612. The debtor can accomplish this "either by saving the amounts received from the tax credits and using them to pay expenses during the year, or by delaying paying bills and deferring purchases until she received the tax credits." *Morales*, 563 B.R. at 874.

Thus, the bankruptcy court's approach does not make debtor's plans less feasible. If anything, this approach makes the debtor's plan *more* feasible because it gives the debtor more flexibility in their budget to account for additional expenses throughout the year. *See id.* at 875 ("Rooted in all of these approaches is the sensible recognition that, to succeed in a chapter 13 case, a debtor must have some flexibility in his budget.").

    4.  *The Bankruptcy Court's Holding Promotes The Purposes of Chapter 13*

In light of the analysis *supra*, we need not delve into the purposes behind Chapter 13 or public policy arguments. In this context, we have said that "[r]ights depend … on what the Code provides rather than on notions of equity." *Sunbeam Prod., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372, 376 (7th Cir. 2012) ("[A]rguments based on views about the purposes behind the Code, and wise public policy, cannot be used to supersede the Code's provisions.") (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639, 649 (2012)).

Nevertheless, the bankruptcy court's holding also promotes the underlying purposes of Chapter 13, "which are to allow the debtor a fresh start where it is possible to do so without liquidating the debtor's assets …, while at the same time ensuring that the debtor devotes all of her disposable income during the life of the plan to repaying creditors." *Germeraad v. Powers*, 826 F.3d 962, 971 (7th Cir. 2016). The purpose of providing the earned income tax credit to the working poor is to "help them meet the basic costs of life." *In re Brockhouse*, 220 B.R. 623, 625 (Bankr. C.D. Ill. 1998); *see also Sorenson v. Sec'y of Treasury of U.S.*, 475 U.S. 851, 864 (1986). By allowing debtors

to retain the portion of their tax credit that is used for reasonably necessary living expenses, the bankruptcy court's approach ensures that debtors will actually be able to make their plan payments and get the fresh start envisioned by Chapter 13.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

MANION, *Circuit Judge*, concurring in part and concurring in the judgment. I join the vast majority of the court's well-written opinion, but write separately out of concern that this case should not have been here on direct appeal. Particularly, there are two things that future panels should watch for when a case comes here on direct appeal from a bankruptcy court. First, it's important that we not grant direct appeal in the absence of a petition filed in accordance with Federal Rule of Appellate Procedure 5. And second, we should not grant such a petition if there is no dispute between the parties on the issue that prompted the bankruptcy court to certify the case in the first place.

This court has jurisdiction over a direct appeal from bankruptcy court if (1) the bankruptcy court certifies that the judgment involves a question of law that we have not yet decided; *and* (2) we authorize the direct appeal. 28 U.S.C. § 158(d)(2); see *In re Turner*, 574 F.3d 349, 357 (7th Cir. 2009) (Sykes, J., dissenting). Thus, we have discretion to deny direct review even if the bankruptcy court certifies the case. That makes it very important for us to adhere to the rules and require the party seeking to invoke our jurisdiction to file a petition pursuant to Rule 5. As Judge Sykes wrote in *Turner*, a petition is not perfunctory, but "a substantive adversarial pleading intended to persuade the appellate court to accept the case." 574 F.3d at 359. It also triggers the opposing party's opportunity to respond with reasons why we should not accept jurisdiction. *Id.* Without a petition, we cannot properly exercise our discretion to accept or reject a direct appeal and so we end up deferring to the bankruptcy court's certification decision. The bankruptcy court's decision to certify a particular case may be correct, but we have an obligation to determine for ourselves whether the case truly merits direct review.

This is the type of case that probably should have gone through the normal process of appeal to the district court first. There was simply no compelling reason to grant direct review here. If we had required the trustee to file a petition, we would have seen that the parties were in agreement on the only issue the bankruptcy court deemed certifiable: whether the earned income tax credit counts as income under the Bankruptcy Code. The lack of adversarial briefing on this question makes the present case a poor vehicle for its resolution. See *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1773 (2015) ("San Francisco, the United States as *amicus curiae*, and Sheehan all argue (or at least accept) that § 12132 applies to arrests. No one argues the contrary view. As a result, we do not think that it would be prudent to decide the question in this case."). Like the Supreme Court when it denies certiorari, we should as a prudential matter decline to hear direct appeals in cases where the only issue deemed certifiable is not disputed.

All that being said, what's done is done. We have agreed to hear this case and there is no reason to send it back at this point. I join all but Parts II-A and II-B of the court's well-reasoned opinion because it correctly holds that the bankruptcy court did not abuse its discretion in overruling the trustee's objections to the debtor's Chapter 13 plan. Because we have no adverse briefing on the issue and its resolution would not affect the outcome, I would express no opinion on whether the earned income tax credit qualifies as income under the Bankruptcy Code. Since we have already agreed to take jurisdiction, I concur in the judgment to affirm the decision below.